99 F.3d 1139
 153 L.R.R.M. (BNA) 2800
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
HOWARD BAER, INC. and Crystal Carriers, Inc., Joint
Employers, Respondents,
Gregory Baer, Additional Respondent in Contempt.
 No. 94-6260.
 United States Court of Appeals, Sixth Circuit.
 Aug. 27, 1996.
 
 N.L.R.B., Nos. 7-CA-34536 7-LA-34670.
 NLRB
 ORDER ENFORCED.
 Before: ENGEL, MARTIN, and BOGGS, Circuit Judges.
 
 ORDER
 
 1
 The National Labor Relations Board (the "Board") petitions for an adjudication in civil contempt of Respondents Howard Baer, Inc., Crystal Carriers, Inc., and Gregory Baer for failing to comply with the November 22, 1994, judgment of the court. The Respondents move to amend the judgment, and the Board opposes the motion to amend. On November 14, 1995, the court referred these matters to United States District Judge Thomas A. Wiseman, as a special master, for a report and recommendation as to findings of facts and conclusions of law. The special master's Report and Recommendation (the "Report") has been submitted to the court and served on the parties. Neither the Board nor the Respondents have any objections to the Report.
 
 
 2
 The court hereby adopts the Report in its entirety. The court concludes that the Respondents' motion to amend the November 22, 1994, judgment must be denied. The court finds the Respondents in civil contempt of this court's November 22, 1994, judgment by failing to take the following actions ordered by the court: 1) failing to offer reinstatement to Thomas Paulson and by discharging him for a second time in March of 1994; and 2) failing to sign and to post at their facilities in Romulus, Michigan and Cincinnati, Ohio, copies of the Notice to Employees attached as an appendix to the judgment. The court finds that the Board has failed to prove by clear and convincing evidence that the Respondents are in civil contempt for failing to offer reinstatement to Leonard Moody or by failing to expunge the personnel files of Thomas Paulson and Leonard Moody.
 
 
 3
 It therefore is ORDERED that Respondents Howard Baer, Inc., Crystal Carriers, Inc., and Gregory Baer shall purge themselves of their civil contempt of court by:
 
 
 4
 1. offering Thomas Paulson immediate reinstatement to his former job or to a substantially equivalent position, without prejudice to his seniority rights or other rights and privileges and permitting him to supplement his employment application to include his omitted employers;
 
 
 5
 2. to post at their facilities in Romulus, Michigan and Cincinnati, Ohio, copies of the Notice to Employees attached as an appendix to the judgment of November 22, 1994, except that the final paragraph of the notice shall be amended to delete any references to Leonard Moody. Copies of the notice, on forms provided by the Regional Director for Region 7 of the National Labor Relations Board (Detroit, Michigan), after being duly signed by the Respondents' authorized representative, shall be posted by the Respondents immediately upon receipt and maintained for 60 consecutive days in conspicuous places, including all places where notice to employees are customarily posted. Reasonable steps shall be taken by the Respondents to ensure that the notices are not altered, defaced, or covered by any other material;
 
 
 6
 3. at the close of this case, to expunge all references to the unlawful transfer or reassignment of Leonard Moody and Thomas Paulson and to their unlawful constructive discharges of April 1993, from the documents located in the litigation and junk files of Jack Preston, the Romulus Terminal Manager; and,
 
 
 7
 4. filing sworn statements with the Clerk of the Sixth Circuit, with copies to the Board, within 21 days of the entry of this order, showing what steps have been taken by Respondents to fully comply with the provisions of this order.
 
 
 8
 In order to ensure the Respondents' compliance, the Respondents are required to post a $25,000 bond in the registry of the United States District Court for the Eastern District of Michigan, to be remitted to the Respondents upon their compliance with all of the affirmative requirements of this order. Any dispute arising as to the form or sufficiency of the bond should be addressed to the special master.
 
 
 9
 A controversy has arisen with respect to the request by the Board for an award of costs, fees, and expenses. The Board is directed to file with the court a separate motion for such an award, specify in detail the amounts requested, and the basis for such an award. The Respondents may file a response to the Board's motion within fourteen days of its service upon them. The court will address the matter in a subsequent order.
 
 
 10
 IT IS SO ORDERED.
 
 REPORT AND RECOMMENDATION
 
 11
 WISEMAN, Senior District Judge.
 
 I. Statement of the Case
 A. Introduction
 
 12
 This case is before this Court under a November 14, 1995 order issued by the United States Court of Appeals for the Sixth Circuit designating this Court to determine whether Respondents are in civil contempt for failing to comply with the Sixth Circuit's November 22, 1994 judgment. At the outset, this Court points out, as it did on the last day of testimony, that this case should have been settled long ago; it should have never gotten this far.
 
 B. Background and Procedural History
 
 13
 Howard Baer, Inc. and Crystal Carriers, Inc. ("Respondents")[1] are for-hire motor carriers engaged in interstate commerce. Respondent Gregory Baer, Secretary-Treasurer of Respondents Howard Baer, Inc. and Crystal Carriers, Inc., is responsible on behalf of Respondents of dealing with corporate legal issues. He is not an attorney.
 
 
 14
 This case originated with allegations by the National Labor Relations Board (the "Board") that Respondents constructively discharged Thomas Paulson and Leonard Moody, two of their semi-truck drivers, in April 1993 by changing their job assignments from straight runs to routes requiring bread delivery to stores.[2]
 
 
 15
 In November 1993, Administrative Law Judge Robert W. Leiner ("ALJ") conducted an unfair labor practice hearing, and on April 12, 1994, the ALJ issued his decision finding that Respondents had unlawfully discriminated against both Paulson and Moody. More specifically, the ALJ found that Respondents' unlawful actions transpired in response to Paulson's and Moody's activities in support of the Union's[3] organizational campaign in violation of Section 8(a)(3) of the National Labor Relations Act ("the Act").
 
 
 16
 In addition to this finding, the ALJ ordered, in pertinent part, that Respondents 1.) take affirmative action to offer reinstatement to Paulson and Moody, 2.) expunge from Respondents' records any references of Paulson's and Moody's unlawful transfer and reassignment, and 3.) post notices concerning remedial actions as to the unlawful discharges. In greater detail, the order stated that Respondents Howard Baer, Inc. and Crystal Carriers, their officers, agents, successors, and assigns were to:
 
 
 17
 (a) Offer their employees, Thomas Paulson and Leonard Moody, immediate reinstatement to their former jobs as Columbus-Romulus drivers, or, if those jobs no longer exist, to substantially equivalent positions, without prejudice to their seniority or other rights and privileges....
 
 
 18
 (b) Expunge from their records any references to the unlawful transfer or reassignments of Leonard Moody and Thomas Paulson and to their unlawful constructive discharge of April, [sic] 1993, and notify each of them, in writing, that this has been done and that any evidence in the records relating to the unlawful transfers, reassignments and constructive discharges will not be used hereafter in personnel action against them.
 
 
 19
 * * *
 
 
 20
 * * *
 
 
 21
 (d) Post at its facilities ... copies of the attached notice ... signed by [Respondent's authorized representative] ... [to be] maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted. Reasonable steps shall be taken by the respondent to insure that the notices are not altered, defaced, or covered by any other material.
 
 
 22
 Crystal Carriers, Inc. and Howard Baer, Inc. did not seek review of the ALJ's decision.
 
 
 23
 On March 18, 1994, prior to the issuance of the ALJ's decision, Respondents discharged Paulson, allegedly for falsifying his employment application. Paulson was not employed by Crystal Carriers at this time. This discharge occurred four months after the hearing before the ALJ, at which Paulson first revealed that he had omitted a prior employer from his application.
 
 
 24
 On May 24, 1994, Respondents made an offer of reinstatement to Moody, effective May 28, 1994. Asserting that the offer was not what the ALJ had ordered in the original hearing, Moody rejected the offer.
 
 
 25
 The Board issued an order dated May 27, 1994, summarily adopting the ALJ's order. Before the Board's May 27, 1994 order, Respondent Gregory Baer ("Mr. Baer"), Respondents' Secretary-Treasurer, contacted Amy Bachelder, an attorney with Region 7 of the NLRB who litigated the underlying case before the ALJ, to resolve primarily the issue of backpay. Several discussions took place between the two; however, this matter was not resolved.
 
 
 26
 On July 19, 1994, Paulson filed an unfair labor practice charge, Case No. 7-CA-36165, alleging that his subsequent discharge by Respondents was unlawful. Caroline Van Ness, a supervisor for Region 7, solicited Respondents to present evidence on their reason for discharging Paulson. Respondents answered with evidence supporting its position that the discharge was lawful because Paulson had omitted part of his employment history on his employment application. As a result, Respondents asserted he was disqualified from operating a commercial vehicle. On September 6, 1994, Regional Director William C. Schaub, Jr. informed Respondents by a letter that the Board was going to hold Paulson's charge concerning his March 1994 discharge (Case No. 7-CA-36165) in abeyance pending the resolution of the underlying charges. Based on this letter and many discussions with Board agents, Baer realized that the Board was not going to hear Paulson's charge administratively until full compliance was achieved in the underlying case.
 
 
 27
 On September 16, 1994, the Region reminded Respondents of their obligations under the Board's order and notified them that it would seek enforcement of the Board's order. As of that date, Respondents had not signed and posted the required notice or expunged the personnel records of Paulson and Moody. Prior to enforcement of the Board's order, Respondents chose not to seek modification of the Board's notice provision regarding Paulson or of the reinstatement relief ordered previously by the Board. Subsequently, on November 22, 1994, the United States Court of Appeals for the Sixth Circuit entered an unreported judgment enforcing the Board's order in its entirety.
 
 
 28
 On March 16, 1995, Region 7 notified Respondents that it would recommend the Board to institute civil contempt proceedings if Respondents' did not comply with the Sixth Circuit's order. On March 31, 1995, Region 7 notified Respondents that given their failure to comply fully with the order, contempt proceedings were being sought against Respondents. After receiving the March 31, 1995 letter, Respondents sought unsuccessfully to negotiate a settlement or to have the Board convene a compliance proceeding under Section 102.52 of the Board's Rules and Regulations to address the adequacy of their compliance with the Sixth Circuit's order. During these discussions, Respondents requested that Case No. 7-CA-36165 be litigated or the matter referred to compliance. The Board chose not to convene a compliance proceeding and instead chose to authorize contempt proceedings.
 
 
 29
 On August 7, 1995, the Board filed a petition with the Sixth Circuit to adjudge Respondents in civil contempt for their failure to comply with the Sixth Circuit's November 22, 1994 judgment. On August 14, 1995, the Sixth Circuit ordered Respondents to file a sworn answer to the Board's petition by September 5, 1995. On September 5, 1995, Respondents filed their answer, admitting in part, and denying in part, the allegations contained in the Board's petition and filed a Motion to Amend the Judgment.
 
 
 30
 On September 11, 1995, the Board filed its response in opposition to Respondents' motion to amend judgment and a motion requesting the appointment of a special master. On September 18, 1995, Respondents filed their response to the Board's motion. Finally, the Sixth Circuit issued an order dated November 14, 1995, designating Senior District Court Judge Thomas A. Wiseman, Jr. as special master.
 
 
 31
 II. Applicable Legal Standards of Civil Contempt Proceedings
 
 
 32
 In order to prevail in a civil contempt proceeding, the Board must establish a violation of the court's order by clear and convincing evidence. Rolex Watch U.S.A., Inc. v. Crowley, 74 F.3d 716, 720 (6th Cir.1996); Glover v. Johnson, 934 F.2d 703, 707 (6th Cir.1991); NLRB v. Decaturville Sportswear Co., 518 F.2d 788, 790 (6th Cir.), cert. denied, 423 U.S. 913, 96 S.Ct. 217, 46 L.Ed.2d 141 (1975). To hold the Respondents in civil contempt, this Court must find that Respondents "violated a definite and specific order of the court requiring [them] to perform or refrain from performing a particular act or acts with knowledge of the court's order." Rolex Watch U.S.A., 74 F.3d at 720, quoting NLRB v. Cincinnati Bronze, Inc., 829 F.2d 585, 591 (6th Cir.1987). In addition, since this case is a civil proceeding, not a criminal one, the intent of a party to disobey a court order is "irrelevant to the validity of [a] contempt finding;" willfulness is not an element of civil contempt. Rolex Watch U.S.A., 74 F.3d at 720, quoting In re Jaques, 761 F.2d 302, 306 (6th Cir.1985). In making this determination, this Court examines Respondents' actions concerning both Paulson and Moody, and Respondents' actions concerning the notice posting and expunging of records.
 
 III. Paulson's Reinstatement[4]
 
 33
 This Court finds that Respondents violated the Sixth Circuit's November 22, 1994 order by failing to offer reinstatement to Thomas Paulson and by discharging him for a second time in March 1994.
 
 A. Factual Background
 
 34
 Respondents have taken no action to offer reinstatement to Thomas Paulson as ordered by the Sixth Circuit in its November 22, 1994 Order. In fact, Respondents discharged Paulson a second time by a letter dated March 18, 1994. Respondents asserted that this second discharge was based upon his failure to include on his original employment application a short-term employer, R.J. Liddy, from 1987. This omission is Respondents' sole reason for terminating Paulson's employment. At the time of this second termination, Paulson was not working for Respondents'. Although Romulus Terminal Manager Jack Preston signed the letter of termination, the decision to discharge Paulson came directly from Respondents' headquarters based in Nashville, Tennessee.
 
 
 35
 During the underlying ALJ hearing held on November 15, 1993, Respondents discovered this omission from Paulson's application. Despite this fact, Respondents did not assert at this hearing, or in their post-hearing brief, that Paulson was not entitled to reinstatement because of this omission. Rather, Respondents used this omission for the sole purpose of challenging Paulson's credibility. Moreover, in their post-hearing brief, which was filed more than one month after their discovery of this omission, Respondents cited the applicable DOT regulations requiring the inclusion of all past driving employers without mentioning that Paulson was "unqualified to drive" or that he had been terminated for his "dishonesty." Respondents waited four months after the underlying Board hearing before notifying Paulson that his employment was being terminated for a second time.
 
 
 36
 Paulson omitted this information from his 1991 employment application with Respondents because he worked for the employer, R.J. Liddy, for only three months on a part-time basis in July 1987; because the R.J. Liddy unlawfully terminated him for his union activities; because Preston told him in their initial conversation that Respondent was a non-union carrier; and because he had been unable to obtain employment when listing Liddy as a former employer on his job application. Focusing on this last reason, Paulson explained that he was turned down by several prospective employers when listing R.J. Liddy on his application and that he omitted them because he "had to eat." In fact, after he stopped listing R.J. Liddy on his applications, he was hired by Crystal Carriers, Ray Molder, American Waste, Pioneer, and Ryder. When submitting his applications to these employers, Paulson informed them that he had not put down a complete list of employers because there was not enough room on the application list for all of his employers and because he had worked for some of them for a short time.
 
 
 37
 When Preston handed the employment application to Paulson and the other applicants, he did not provide them a copy of DOT regulations or a copy of Respondents' procedures manual. Neither Preston nor Baker told Paulson or the other applicants that every past employer was to be listed. In fact, other Romulus-Columbus drivers testifying in this contempt proceeding, Charles Thompson and Leonard Moody, both stated that they had also left off required past employers from their applications with Respondents. Even though employees were provided with copies of DOT regulations and the employee policy and procedures manuals shortly after they started working for Respondents, they were never informed or given an opportunity to go back and modify their employment applications after reviewing these materials.
 
 
 38
 After telling Respondents that he had omitted a few of his previous employers from his application, Respondents' Terminal Manager Jack Preston told Paulson that the omission did not matter as long as he had someone to call. Respondents' Vice President, Ronald Baker, who was supervising the hiring for the soon-to-be opened Romulus terminal, was present during this conversation and merely shrugged his shoulders.
 
 
 39
 Respondents have repeatedly failed to verify properly their driver's employment histories, as required by DOT regulations. 49 C.F.R. § 391.23(b), (c); 49 C.F.R. § 391.23(a)(2). As a result, these drivers are technically "unqualified" to drive pursuant to applicable DOT regulations. Similarly, Respondents have violated other DOT regulations such as failing to maintain required I-9 forms, completed driving tests, DOT tests, and driver's license certificates for Paulson and Moody. 49 C.F.R. § 391.23(a)(1). Finally, Respondents repeatedly asked its drivers, including Paulson, Moody, and Thompson, to exceed DOT driving hours limitations and expected their drivers to alter their logs to comport with DOT regulations. This misconduct, unlike Paulson's omission of several short-term employers from his application, directly impacted important safety considerations.
 
 
 40
 Prior to discharging Paulson a second time on March 18, 1994, Respondents did not give Paulson a chance to explain why he had not listed R.J. Liddy on his employment application or to supplement his application in order to comply with DOT's regulation requiring drivers to list all past driving employers for the prior 10 year period. Significantly, Respondents prepared a Disqualification of Driver form for Paulson, backdated it to August 6, 1991, had it signed by Respondents' Director of Safety Larry Monroe, but failed to send it to Paulson. Moreover, Respondents' letter of discharge dated March 18, 1994 makes no reference to such a form or any other enclosure. In fact, it was Monroe who directed Preston to fire Paulson and sent Preston the language to include in the termination letter.
 
 
 41
 The only other driver terminated by Respondents for failing to complete properly his employment application was Carlos Stanley, who failed to disclose that his license had been suspended for drunk driving. On his employment application, Stanley had also falsely checked the block on his application stating that his license had never been suspended, cancelled, or revoked. Respondents have an absolute policy requiring them not to hire a driver with a DUI conviction. Excluding Paulson and Stanley, Respondents have never terminated the employment of any driver for failing to include a past employer on an employment application. In fact, when Respondents' Director of Safety Larry Monroe was told about certain DOT infractions committed by Charles Thompson, including his failure to list all previous employers for the requisite period, Monroe testified that Thompson would have received a warning letter for the first infraction, received a three day suspension for any further infractions, and terminated for a third infraction within a 90 day period of a second infraction.
 
 B. Legal Principles and Their Application
 
 42
 This Court finds that Respondents' termination of Paulson was clearly pretextual for the following reasons: 1.) Respondents waited four months from the time they learned that Paulson had allegedly "falsified" his application before discharging him a second time in March 1994; 2.) Paulson disclosed his application omissions when he submitted his application to Preston and Baker with their permission; 3.) Paulson was not permitted an opportunity to supplement his application to comply fully with all applicable DOT employment application regulations; and 4.) Paulson received disparate punishment for his omission of one short-term employer for over a ten year period.
 
 
 43
 1. Respondents' Four Month Delay in Discharging Paulson
 
 
 44
 The law is well-settled that the lack of immediate action in disciplining an employee supports the inference of an illegal motive by the employer. See NLRB v. Southland Paint Co., 394 F.2d 717, 732 (5th Cir.1968) (pretext shown where company imposed disparate discipline for the same misconduct and waited two weeks before imposing discipline on union supporter); Miller v. Kansas Elec. Power Coop., Inc., 1989 WL 161515, * 5 (D.Kan. Dec. 21, 1989) (pretext established where company waited for three months after learning of document removal before discharging employee); Abbey's Transp. Serv., Inc. v. NLRB, 837 F.2d 575, 581 (2nd Cir.1988) (pretext shown where employer waited one week after argument between employee and employer before discharging employee and where employee received disparate discipline; pretext also shown where the company waited two days before discharging another employee who had driven in an unsafe manner); NLRB v. Longhorn Transfer Serv., Inc., 346 F.2d 1003, 1006 (5th Cir.1995) (no discharge until nine days after employee damaged a building while driving truck established pretextual termination and employer's union animus); Guerdon Indus., 255 NLRB 610, 617 (1981) (company's reason advanced for dismissal of employees found to be pretextual where company waited several weeks before terminating their employment).
 
 
 45
 It is undisputed that Respondents waited from November 1993 until March 1994 to discharge Paulson for a second time. During this four month period, Respondents did not investigate Paulson's omission or discuss with Paulson the reason for this omission. This four month delay and the lack of an explanation for this delay reflect that the March 1994 termination of Paulson was pretextual.
 
 
 46
 2. Paulson's Disclosure of Application Omissions
 
 
 47
 The existence of a legitimate reason to discharge an employee does not serve as a defense to an alleged unlawful discharge where that legitimate reason is not a moving cause of the discharge. New Foodland, Inc., 205 NLRB 418, 420 (1973) (local law forbade employing anyone under 21 years of age and applicant had lied about her age on the employment application). If the reason for the discharge asserted by the employer is a pretext, then the nature of the pretext is immaterial. Id. This reasoning applies in case where the pretext involves reliance on a statute. See id. In addition, the falsification of a prior employment application with an employer does not per se bar one from all future employment with that employer. Justrite Mfg., Co., 238 NLRB 57, 68 (1978).
 
 
 48
 Turning to the facts of the case at bar, Paulson informed Preston and Baker when he submitted his complete employment application of his omission of a few of his previous employers. Both Preston and Baker acknowledged Paulson's statement, indicating that it was not significant. In fact, Preston stated that it did not matter and that he simply needed the names of a few past employers to contact; Baker merely shrugged his shoulders. However, Respondents did not assert that Paulson was an "unqualified" driver and that they were required to discharge him under DOT regulations until their answer to the Board's contempt petition. Additionally, this allegation was not asserted at the original Board hearing. Thus, this conduct supports the pretextual nature of Respondents' reason for discharging R.J. Liddy from his March 1994 employment application.
 
 
 49
 3. Respondents' Failure to Allow Paulson to Comply with All
 
 
 50
 Applicable DOT Employment Application Regulations
 
 
 51
 DOT Regulations do not require discharge; they only require disqualification from driving until the driver is qualified to drive. See Schmidt v. Safeway, Inc., 864 F.Supp. 991, 999 (D.Oregon 1994). Allowing Paulson to supplement his employment application, thereby enabling him to become a "qualified" driver, comports with prior Board cases involving employees not qualified for their jobs. See De Jana Industries, Inc., 305 NLRB 845, 852 (1991) (reinstatement of employee to truck driver position conditioned on employee's establishing that he have a valid driver's license).
 
 
 52
 During the four month period from November 1993 until March 1994, Respondents never gave Paulson the opportunity to supplement his employment application to list R.J. Liddy as a former employer. If Respondents were truly concerned about strictly complying with every DOT regulation, they would have simply had Paulson supplement his employment application.
 
 
 53
 4. Respondents' Disparate Punishment of Paulson for his
 
 Omission on his Employment Application
 
 54
 Consistently, courts have held that disparate treatment of a union supporter by an employer supports the inference of an illegal motive by the employer. See NLRB v. Future Ambulette, Inc., 903 F.2d 140, 143 (2d Cir.1990) (termination for loss of driver's license is a mere pretext where the employer retained other drivers who had lost licenses); Tel Data Corp., 315 NLRB 364, 367 (1994) (respondents treated employee in a disparate manner where respondents encouraged under and over reporting of hours and discharged employee for such practice).
 
 
 55
 Respondents have not supplied any evidence of similar punishment for non-compliance with this particular DOT regulation other than for employee Carlos Stanley, who had a poor driving record and a history of substance abuse. In addition, Respondents are aware of Charles Thompson's omission of prior employees from his employment application, as well as falsifying his records to conceal DOT mileage violations; however, they have not terminated Thompson for this conduct.
 
 
 56
 Moreover, Respondents' policy is to issue a warning letter when a driver violates the more serious DOT hours of service regulations, such violations endangering both the public and the driver. In fact, Respondents only terminate a driver for exceeding the DOT hours of service regulations when a driver violates these regulations three times in a 90 day period.
 
 
 57
 Paulson's failure to list a former employer on his employment application presents far less risk upon the public. In addition, Respondents did not issue Paulson a warning letter allowed to violators of far more serious regulations. Thus, Respondents' actions reflect the pretextual reasoning concerning Paulson's discharge.
 
 
 58
 5. Respondents' Reliance on After Acquired Evidence Doctrine
 
 
 59
 In the recent case of McKennon v. Nashville Banner Publishing Co., 513 U.S. 352, 115 S.Ct. 879, 886, 130 L.Ed.2d 852 (1995), the Supreme Court held that reinstatement is not the appropriate remedy in circumstances where the employer has legitimate grounds for termination of the employee and establishes that it would have terminated the employee had it known of the conduct at the time of discharge. The Court stated "[w]here an employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such severity that the employee would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." 130 L.Ed.2d at 864. In the case at bar, Respondents have clearly failed to satisfy the requirements set forth in McKennon.
 
 
 60
 The only evidence supporting Paulson's discharge for wrongdoing asserted by Respondents was his failure to list one employer, R.J. Liddy, from his employment application. In fact, Paulson worked for this employer for only three months. It is undisputed that Paulson had a satisfactory driving record while working for R.J. Liddy during this three month period and that he was constructively discharged from that job unlawfully for his union activities. Furthermore, it is undisputed that Paulson was a satisfactory driver while he was working for Respondents and that Respondents had no complaints about his work or his driving during his employment. In short, Paulson's omission of R.J. Liddy had nothing to do with his performance as a driver while employed at R.J. Liddy. Concerned that R.J. Liddy might report his union activities and his unlawful termination resulting from this conduct to prospective employers, Paulson omitted R.J. Liddy from his application. There was nothing in Paulson's record during his three months at R.J. Liddy negatively bearing upon his ability and qualifications to drive for Respondents.
 
 
 61
 The mere act of failing to list all past employers on an employment application does not justify or excuse Respondents' unlawful discharge of Paulson. See Hyatt v. Northrop Corp., 80 F.3d 1425, 1431-33 (9th Cir.1996) (employee not barred from asserting wrongful discharge claim where employee made misrepresentations on his employment application, which did not affect employee's work performance and did not cause any potential damage to employer); see also Miera v. NLRB, 982 F.2d 441, 447 (10th Cir.1992) (employee's conduct of lying to employer "did not rise to the level of misconduct requiring that reinstatement should be denied" where the misrepresentation was made in an attempt to avoid being fired under employee's policy found to be the result of anti-union animus).
 
 
 62
 In Johnson v. Honeywell Info. Sys., Inc., 955 F.2d 409, 414 (6th Cir.1992), the Sixth Circuit developed a fraud-type analysis for cases involving misrepresentations in a resume or employment application, as opposed to cases concerning job misconduct. The court held that the employer would be entitled to summary judgment if "the misrepresentation or omission was material, directly related to a candidate for employment, and was relied upon by the employer in making the hiring decision." Id. The court found these requirements to be necessary "to prevent an employer from combing a discharged employee's record for any and all misrepresentations, no matter how minor or trivial, in an effort to avoid legal responsibility for an otherwise impermissible discharge." Id. In its decision, the court indicated that the nature and number of the misrepresentations in connection with the employment application requirement at issue was a factor to be considered. See id.
 
 
 63
 Accordingly, Respondents' discharge of Carlos Stanley for his statement that his license had never been suspended for a DUI conviction is the type of employment application misconduct justifying an employee's subsequent discharge. See Milligan-Jensen v. Michigan Technological Univ., 975 F.2d 302, 303 (6th Cir.1992) (discharge justified where employee had omitted a prior DUI conviction from her employment application); W. Kelly Gregory, Inc., 207 NLRB 654-55 (1973) (Board refused to award backpay and reinstatement where driver failed to include on his employment application former employer that had terminated his driving employment because of his drinking problem); Dotson v. U.S. Postal Service, 977 F.2d 976, 977 (6th Cir.1992) (employee's omission of important medical history concerning back injury and dismissal from two jobs due to this injury on employment application held to be sufficient for termination). But see Ohio Ferro-Alloys Corp., 209 NLRB 577 (1974) (Board ordered reinstatement where employee failed to include arrest for armed robbery in employment application and ordered employee to amend employment application).
 
 
 64
 Moreover, the regulatory language relied upon by Respondents, 49 C.F.R. § 383 et seq., was adopted "to help reduce or prevent truck and bus accidents, fatalities, and injuries by requiring drivers to have a single commercial motor vehicle driver's license and by disqualifying drivers who operate motor vehicles in an unsafe manner." 49 C.F.R. § 383.1. In this case, Respondents have asserted only that Paulson failed to list R.J. Liddy on his employment application, not that Paulson was an unsafe driver. Thus, the purpose of the DOT regulation reporting requirements was not frustrated by Paulson's omission. Furthermore, any omission could have been easily corrected to satisfy DOT regulations had Respondents given Paulson the opportunity to supplement or amend his employment application.
 
 
 65
 For the reasons set forth above, the Board has clearly satisfied its burden of proof in showing that Paulson's discharge was pretextual.
 
 IV. Moody's Reinstatement
 
 66
 This Court finds that the Board has failed to prove by clear and convincing evidence that the position offered to Moody by Respondents was not the same as or substantially equivalent to his former job.
 
 A. Factual Background
 
 67
 1. Crystals' Operation and the Columbus Route
 
 
 68
 Crystal began operations in July 1991 with approximately 12 drivers and is engaged in the delivery of bread and bakery products to Kroger Food Store locations throughout Michigan. The focus of the litigation in this case concerns a delivery operation based out of Crystal's Romulus, Michigan facility.
 
 
 69
 The "Columbus route" or "Columbus run" involves the pickup of bakery products from Kroger's Columbus bakery, which is located in Columbus, Ohio. Once the drivers return to Romulus with the bakery goods, other Crystal drivers then deliver, or "peddle," these goods to Kroger stores. In addition to these bakery pickup and deliveries, Crystal drivers also deliver interoffice mail.
 
 
 70
 On a daily basis, Crystal receives a bread and bakery product order from the Columbus bakery. This order states the volume of the bread and bakery products to be picked up the following day. Having this information, Crystal then determines the number of Columbus drivers needed for the daily bakery order.
 
 
 71
 In September 1991, Crystal began hauling Kroger brand dry goods and groceries from Dry Ridge, Kentucky to Romulus for distribution in Michigan. These dry good peddle routes, in which groceries on pallets are delivered to the stores, differ from bread peddle routes. The dry goods delivery is less strenuous than the bread peddle. Unlike the bread peddle, the dry good peddle involves the store's employees, not the drivers, unloading the goods. In situations where the Crystal driver is in a hurry, the driver can use a motorized pallet to unload the freight.
 
 
 72
 Differing from many industries that run on distinct eight hour shifts, the Columbus route does not have an assigned "shift." Instead, Crystal individually dispatches its drivers on runs dictated by the pickup schedule at the Columbus bakery. In other words, a driver is scheduled to leave Romulus for Columbus at or before a time that will enable him to be there when the particular load is ready for pickup.
 
 
 73
 Prior to his constructive discharge in April 1993, Moody made the Columbus run. Moody would leave Romulus around 12:00 midnight and arrive at the bakery around 4:30 a.m. Working six days per week, Moody drove this Columbus run every day except Monday. The average time to drive between Columbus and Romulus is three hours and forty five minutes. To complete the Columbus run, it takes a driver between seven and one-half to eight hours to complete the trip.
 
 
 74
 Crystal designates one driver, usually the one with the first load pickup at the Columbus bakery, to stop and deliver both mail and bread to the Kroger store in Monroe, Michigan. A Romulus-based Columbus driver delivers the Monroe store's mail on his way to Columbus. Unloading the bread at the store takes about twenty minutes and is equivalent to a bread peddle performed at the other stores.
 
 
 75
 On October 5, 1993, the Columbus bakery notified Crystal by letter that the Columbus pickup and store delivery would be reduced from six days per week to five days per week. After this elimination of the sixth day of the Columbus run, Crystal's only available work on a sixth or seventh day was a dry goods peddle. In addition, after October 5, many other drivers assigned to the Columbus run were regularly assigned to a sixth day of dry goods peddling. This five day Columbus run along with a sixth day of dry goods peddling reflects a typical work week for a number of Columbus drivers.
 
 
 76
 On or about May 3, 1994,[5] the Columbus Bakery moved Crystal's first pickup time by one to two hours. Prior to this time, the first load of bread was ready at approximately in the range between 4:15 and 5:00 a.m., the average being close to 4:30 a.m. After this date and up until May 31, the first pickup was between 5:15 and 6:15 a.m. After this change in pickup time, Thompson generally left for Columbus between 1:15 and 2:00 a.m. and returned back to the Romulus terminal between 9:45 and 11:00 a.m. On most days, Thompson delivered the Monroe store's mail on the way to Columbus and the bread on the way back.
 
 
 77
 Additionally, the record, primarily Thompson's arrival and departure times, appears to indicate another time change beginning on June 1, 1994. Thompson's departure time from Romulus moved to a time ranging between 2:00 and 3:00 a.m., and his departure time from Columbus moved to a range between 6:30 and 7:30 a.m. Under this time change, Thompson normally returned between 11:00 a.m. and 12:00 noon, the record reflecting that on most days Thompson returned a few minutes after 11:00 a.m. Regardless of this possible second time change, May 3, 1994 marks the day that the starting time shifted from 12:00 midnight to 2:00 a.m.
 
 
 78
 The key for determining the time back to Romulus from Columbus is the time that the first load of bread is ready at Columbus bakery, not the time the driver initially leaves from the Romulus terminal. That is, a driver's time is based upon the customer's requirements. Petitioner confuses Thompson's periodic departure times following May 3, 1994 as supposed evidence of a continuation of a 12:00 a.m. start time. However, Thompson sometimes left prior to 2:00 a.m. for his own personal reasons, such as to catch a nap. It is the driver's decision to leave early so long as the pick up is timely.
 
 
 79
 2. Respondents' Offer of Reinstatement to Moody
 
 
 80
 By certified mail, Baer offered Moody reinstatement on May 24, 1994, to be effective May 28, 1994. The reinstatement letter provided for Moody to report to Crystal on May 27, 1994 in order to set up and take a DOT required physical and drug test. Respondents' employment offer to Moody consisted of five days of Columbus runs and a sixth day performing a dry goods peddle. Under this May 24, 1994 reinstatement offer, Moody's runs would begin around 2:00 a.m.; however, this time was not specified in the letter.
 
 
 81
 Moody received Respondents' reinstatement offer on May 26, 1994. Although the Board takes issue with the short period of time between Moody's receipt of the letter and the report date, Moody never asked for more time to consider the offer or complained that he was rushed to make the decision. In fact, the record lacks any evidence to suggest that this time period affected Moody's rejection of the job offer.
 
 
 82
 On the day he received the reinstatement letter, Moody contacted Preston and told him that the position offered was not what was ordered by the ALJ and that he knew his prior position still existed. Although the record is a little unclear, it appears that Moody refused to accept the reinstatement offer on his assumption that the job would begin at 2:00 a.m.[6] and that the job consisted of a dry grocery peddle on the sixth day. Preston referred him to Baer, whom Moody then telephoned.
 
 
 83
 In the telephone conversation[7] between Moody and Baer, Moody told Baer what he had previously told Preston concerning his job. Baer explained to Moody that the Columbus bakery had eliminated bread pickups on the sixth day and now Crystal only had five runs per week to Columbus. According to Baer, Moody only raised the elimination of the sixth day Columbus run and did not raise any objections to the sixth day of peddling during this conversation with Baer. Moody added that the position offered was inconvenient to his wife's babysitting; however, he did not specifically connect the babysitting concern with a particular starting time or suggest a different time. In addition, Moody testified that his "main sticking point was the twelve midnight start." Baer told Moody "to report or don't report." On May 27, 1994, Moody did not report to Crystal for his physical and drug test and he did not report to work on May 28, 1994.
 
 
 84
 Approximately one week after the reinstatement offer, Harris Berman, Region 7's Compliance Officer, contacted Baer to inquire why Moody was not offered six trips to Columbus. Baer explained to Berman that Crystal no longer made six trips per week to the Columbus bakery given the bakery's reduction in its production schedule and its corresponding lack of need for the sixth day run. In addition, the sixth day of dry goods peddle was the best Crystal could do to comply with the ALJ's order. Baer's response satisfied Berman, and Berman never raised the issue of the Respondents' offer of reinstatement again.
 
 
 85
 On August 11, 1994, Mary Strang, an agent with Region 7, sent a letter to Respondents acknowledging that an offer of reinstatement had been made to Moody. This letter did not contest the sufficiency of Respondents' reinstatement offer to Moody nor question Respondent's compliance with the Order requiring reinstatement of Moody.
 
 B. Legal Principles and Their Application
 
 86
 When ordered to reinstate an employee, an employer must offer to return the employee to his previous position, or if that position no longer exists, to a substantially equivalent position. See NLRB v. Seligman and Assoc., Inc., 808 F.2d 1155, 1160 (6th Cir.1986), cert. denied, 484 U.S. 1026, 108 S.Ct. 750, 98 L.Ed.2d 763 (1988) (reinstatement to prior job required where employer offered no evidence that prior job existed); Morvay v. Maghielse Tool and Die Co., 708 F.2d 229, 232 (6th Cir.), cert. denied, 464 U.S. 1011, 104 S.Ct. 534, 78 L.Ed.2d 715 (1983). A job that differs materially in its wages, hours, or working conditions is not the same job. NLRB v. Carlisle Lumber Co., 99 F.2d 533, 539 (9th Cir.1938), cert. denied, 306 U.S. 646, 59 S.Ct. 586, 83 L.Ed. 1045 (1939).
 
 
 87
 Similarly, a proffered job is not substantially equivalent if it obviously and materially deviates from the employee's prior terms and conditions of employment without any valid economic justification. NLRB v. United States Air Conditioning Corp., 336 F.2d 275, 276 (6th Cir.1964). Among the factors to be considered are wages, benefits, hours, location, type of work, working conditions, and security rights. See NLRB v. Oregon Steel Mills, 47 F.3d 1536, 1539 (9th Cir.1995); Associated Grocers, 295 NLRB 806, 827 (1989). A job paying significantly less than the employee's prior job would not be substantially equivalent, all other factors being equal. Standard Materials, Inc. v. NLRB, 862 F.2d 1188, 1193 (5th Cir.1989); Alfred M. Lewis, Inc. v. NLRB, 681 F.2d 1154, 1156 (9th Cir.1982); Halpak Plastics, Inc. 301 NLRB 690 (1991). The issue as to whether one job is substantially equivalent to another, however, must ultimately be determined based upon the individual facts of each case. See NLRB v. State Stove & Mfg. Co., 403 F.2d 656, 657 (6th Cir.1968) (remanding for supplementation of record concerning adequacy of offer of reinstatement requiring employee to work with fiberglass); NLRB v. Interurban Gas Co., 354 F.2d 76, 78 (6th Cir.1965) (whether jobs were substantially equivalent treated as issue of fact). E.g., Mister Fox Tire Co., 271 NLRB 960, 961 (1984) (unlawfully discharged tire changer reinstated to substantially equivalent job even though he was asked to load trailers in the yard, where performing yard work was not uncommon for tire changers).
 
 
 88
 The Board has failed to show by clear and convincing evidence that Respondents' offer of an employment position to Moody was not substantially equivalent to his former job. In addition, the Board has not shown by clear and convincing evidence that Moody's former job still existed at the time of their reinstatement offer.
 
 
 89
 1. Discontinuation of Moody's Prior Job with Respondents
 
 
 90
 Thompson's schedule in late May 1994 was not the same one that Moody had prior to his constructive discharge. Prior to his constructive discharge, Moody drove six days of the Columbus runs each week leaving from Romulus around 12:00 midnight. Thompson's work schedule in May 1994 consisted of only five days of Columbus runs. In fact, on October 5, 1993, Crystal no longer had six days of Columbus runs per week because the Columbus Bakery's cutback to a five day per week schedule. It was impossible for Respondents' to offer Moody a sixth day of Columbus run.
 
 
 91
 Furthermore, Moody's previous job changed a second time on or about May 3, 1994 when the Columbus bakery moved the first pickup time by one to two hours. As a result, Thompson left Romulus between 1:15 and 2:00 a.m. The bakery changed the starting time, not Respondents. Although there is some confusion in the record as to the time shift, the record is clear that there was a shift in the Columbus pickup time, which in turn affected the Romulus departure time. In fact, Moody testified that the 12:00 midnight start time was his main sticking point. However, this starting time was out of Respondents' control. The 12:00 midnight starting time no longer existed.
 
 
 92
 Finally, unlike Thompson, who stops each day at Monroe to peddle bread, Moody only occasionally performed the Monroe bread stop as part of six day job.
 
 
 93
 Given the differences between Thompson's job in late May 1994 and Moody's job prior to his constructive discharge, this Court finds that Moody's former job no longer existed.
 
 
 94
 2. Respondents' Substantially Equivalent Reinstatement Offer
 
 
 95
 to Moody and His Rejection of this Offer
 
 
 96
 The Board has failed to show that the job position offered to Moody was not substantially equivalent to his prior position. As discussed above, the Columbus run starting time, which was changed from 12:00 midnight to 2:00 a.m. on or about May 3, 1996, was beyond Respondents' control. Thus, the closest time that could be offered to Moody was the 2:00 a.m. starting time, which he rejected. Moreover, it is this Court's belief that any job offered by Respondents to Moody would have been unacceptable to him. This belief is supported by Moody's alleged assertion that the 2:00 a.m. starting time, his main sticking point (i.e., Moody wanted a 12:00 midnight starting time), conflicted with his wife's work schedule in relation to his child's care needs.
 
 
 97
 In May 1994, Moody's wife was employed at Pet Supplies Plus. Her employment hours were from 12:00 noon to 9:00 p.m. on Monday, Wednesday, Friday, and Saturday, and from 10:00 a.m. to 5:00 p.m. every other Sunday if she wanted to work that day. As a result, this reinstatement offer included three days on which there was no possible conflict with Moody's wife's work schedule. Moody's child was in kindergarten and returned home from school at approximately 12:10 p.m. in May 1994.
 
 
 98
 The 2:00 a.m. Columbus departure time did not conflict with Moody's wife's work schedule. With a trip of seven to eight and one-half hours, the Columbus run would have allowed Moody to return prior to his wife's starting time of 12:00 noon. In fact, Thompson returned from this trip between 9:45 and 11:00 a.m. in late May of 1994, and he returned to the terminal between 11:00 a.m. and 12:00 noon, mostly returning a few minutes past 11:00 a.m. in June 1994. As noted above, the departure time is based upon the bakery's pickup time, and the driver is permitted to leave earlier if he wishes.
 
 
 99
 Additionally, delays in the daily completion time of a Columbus run would not affect this return time significantly as delays are infrequent and normally under an hour. Alternatively, if the new pickup and departure time on the first Columbus run was truly too late to permit Moody to take the job, then there was no job existing at Crystal that would have been acceptable to Moody.
 
 
 100
 Further testimony by Moody suggests the likelihood that Moody would not have accepted any offer by Respondents'. Moody testified on direct that he would have accepted Respondents' offer if it had been Thompson's midnight shift, five days per week, because he was not employed at the time of the offer. This assertion is not true given that Moody was employed at this time with the Aldworth Company. In fact, his schedule at Aldworth directly conflicted with his wife's work schedule and would have caused the same child care problems that Moody claimed precluded him from accepting Respondents' offer.
 
 
 101
 Moreover, even assuming, arguendo, that Moody was employed at the time of the offer and Moody's wife's schedule was impacted by the offer, it was unreasonable for Moody to turn down a $33,000 per year job to avoid a conflict in work schedules of no more than one hour to accommodate his wife's $11,000 per year job. This logic becomes even more compelling in light of the fact that any alleged child care concerns would have disappeared in three months when Moody's child entered the first grade and would be in school the entire day.
 
 
 102
 Respondents' May 24, 1994 reinstatement offer consisted of five days of Columbus runs and a sixth day performing a dry goods peddle and did not contain any scheduling requirements. This schedule consisted of a regular work week for several of the Columbus drivers. In fact, a typical work week for a Columbus route driver often included the more difficult bread peddle, and not the easier dry peddle offered to Moody. Most significantly, this sixth day dry goods peddle was added to compensate for the loss of the sixth day Columbus run. To Baer's knowledge when he made the offer, the Columbus route drivers regularly performed a dry goods peddle on a sixth day. According to Preston, Moody would have had the option to decline the sixth day of work. In addition, Preston explained that he had other drivers who would have been pleased to have the extra work, but Moody would have been required to do the dry goods peddle if needed.
 
 
 103
 In sum, the Board has failed to meet its burden of proof as to this issue. Moody's prior job was not the same as that of Charles Thompson, and the Respondents' reinstatement offer was substantially equivalent to his prior job. Moody's assertion that Respondents' offer was not what the ALJ ordered simply fails to yield to realities.[8]
 
 V. The Posting of Notice to Employees
 
 104
 Acting through Gregory Baer, Respondents have violated the Sixth Circuit's judgment by failing to sign and post the required notices. Respondents asserted that they were not required to sign and post a notice that was no longer appropriate. More specifically and as discussed above, Respondents relied on Paulson's omission from his employment application, asserting that this omission legally precluded them from reinstating Paulson. As a result, Respondents assert that the notice was inappropriate. Respondents' failed to raise this issue with the ALJ, the Board, or the Sixth Circuit. Regardless of this fact, the notice is appropriate given this Court's finding that Respondents' firing Paulson in March 1994 for his omission of a previous short-term employer in his application was pretextual. This Court finds that Respondents' are clearly in contempt for violating this order, especially given the pretextual nature of their actions.
 
 
 105
 VI. Respondents' Expunging of Personnel Records
 
 A. DAC Records
 
 106
 Respondents use a records service called DAC, located in Tulsa, Oklahoma. DAC electronically stores employment records of its member companies under a uniform coding system used to identify particular information for a particular employee. After an employee leaves employment with a DAC member, the member then enters the employment information with DAC. Respondents use the DAC system to provide employment verification of applicants and drivers license verification checks. Following Paulson's and Moody's initial resignations, later found to be constructive discharges, Respondents provided DAC with information concerning Paulson's and Moody's employment termination. According to DAC records, DAC received the original information concerning Paulson on May 13, 1993 and Moody on April 19, 1993. In addition, DAC records indicate that it received additional information concerning Paulson on June 23, 1994.
 
 
 107
 The Court's Order dated November 22, 1994, required Respondents to "expunge from their records any reference to the unlawful transfer or reassignment of Leonard Moody and Thomas Paulson and to their unlawful constructive discharges of April 1993, and to notify each of them in writing, that this has been done and that any evidence in their records relating to the unlawful transfers, reassignments, and constructive discharges will not be used hereafter in personnel action against them." Despite this November 22, 1994 Order, no effort was made until May 1995 to modify the DAC employment files.
 
 
 108
 In September 1994, Paulson obtained a copy of his DAC employment record, which stated in part:
 
 
 109
 REASON FOR LEAVING: RESIGNED/QUIT OR DRIVER TERMINATED LEASE
 
 WORK RECORD: QUIT UNDER DISPATCH
 PERSONAL CONTACT REQUESTED
 
 110
 By a letter dated October 9, 1994, Paulson sent DAC a letter informing them of his constructive discharge based upon his union activities. A corresponding copy was sent to Baer, Inc, C. Strang of the Board, and Moody. Having received this letter, the Board began investigating this matter and obtained DAC records in October 1994 for Paulson and Moody; Respondents took no action to modify the DAC records. The DAC report obtained by the Board concerning Paulson was the same as that obtained a month earlier by Paulson. Moody's report read in part:
 
 ELIGIBLE FOR REHIRE: NO
 WORK RECORD: NO SHOW
 
 111
 COMPANY POLICY VIOLATION CO. TERMINAL VIOLATION-W/O NOTICE
 
 UNAUTHORIZED PASSENGER
 
 112
 On May 9, 1995, Daniel Collopy, the Board's Senior Trial Attorney in its Contempt Litigation Branch, notified Respondents' counsel of the DAC records concerning Paulson and Moody and encouraged counsel to have Respondents correct these records. This letter indicates that the June 23, 1994 addition to Paulson's DAC report was an accident that he allegedly had been involved in while working with Respondents.
 
 
 113
 At some point in early to mid 1995, Baer instructed Larry Monroe, Respondents' Director of Safety, to expunge the files as ordered, and to Baer's knowledge the records did not exist thereafter. The date of this conversation is unclear; however, it is clear that Monroe's first effort to modify the employment files stored with DAC occurred approximately on May 10, 1995. On April 19, 1995, a month before Collopy's letter, a letter signed by Baer was sent to Paulson and Moody via certified mail informing each of the action taken by Respondents. Corresponding copies were sent to the Board.
 
 
 114
 On May 10, 1995, the day after Collopy's letter to Respondents, Monroe attempted to revise the DAC records. Not having direct access to DAC's computer system, Monroe submitted to DAC a Termination Record Revision Form for Paulson and Moody. This form is required by DAC to change the electronically stored employment records. Monroe requested DAC to delete all references in Paulson's and Moody's work record and add in the work record "Personal Contact Required."
 
 
 115
 Shortly after Monroe's May 10, 1995 attempt to revise the DAC record, Berman, one of the Board's compliance officers, telephoned Baer concerning the DAC record entries. Berman told Baer that it was his understanding that Paulson and Moody were having difficulty in obtaining employment and that Baer needed to correct the DAC record. Following this conversation, on May 25, 1995, Baker submitted by fax a second Termination Record Revision Form for Paulson and Moody, requesting DAC to remove all information on Paulson and Moody. After May 25, 1995, if a DAC member contacted DAC concerning Paulson and Moody, DAC's records would reveal no history of employment with Respondents. This result comports with the way DAC keeps its records-an individual only shows up in the DAC files after they leave employment with a member. After this May 26, 1995 submission, Paulson and Moody were satisfied with the action taken by Respondents to eliminate any reference to them in the DAC records.
 
 B. The Documents in Preston's Files
 
 116
 Crystal maintains a file of driver's qualification records required by the DOT regulations as part of the employee's personnel file. All personnel records are kept at Respondents' offices in Nashville, Tennessee.
 
 
 117
 In response to the Board's discovery request, Respondents provided all records from all sources that it had access to concerning Paulson and Moody. Other than the documents identified as Government Exhibits 41 and 42,[9] which were responsive to discovery request, Respondents have not found a complete personnel or qualifications file on either Paulson or Moody since they were expunged in April 1995.
 
 
 118
 However, unknown to Baer and Monroe, Preston kept a skeleton file of driver employment documents at the Romulus terminal. In this file are copies of a driver's I-9 form, a driver's W-4 form, his complete employment application, and the form completed by the driver designating whom the company should contact in case of emergencies. Preston refers to this file as his "junk file," the purpose of which is to have quick access to a driver's withholding statement and emergency numbers without having to contact Nashville. This file is not an official company file, a driver personnel file, nor a driver qualification file. According to Preston, all of the documents concerning an employee in the junk file is removed when an employee leaves the company.
 
 
 119
 In addition to the "junk file," Preston has kept a litigation file from the inception of this case at the Romulus terminal. In this litigation file were copies of some of the documents formerly kept in Paulson's and Moody's personnel file in Nashville, including their applications for employment. Respondents produced to the Board pursuant to the discovery request any personnel type documents Preston had in both of these files. The driving applications for Paulson and Moody were part of the litigation file, not the junk file. The documents found in the junk file apparently were inadvertently left there.
 
 C. Discussion
 
 120
 On November 22, 1995, the Sixth Circuit entered its Order requiring Respondents to expunge the personnel files of Paulson and Moody. Almost six months later, Respondents made a valid attempt to have the DAC records expunged. These contempt proceedings were filed on August 7, 1995, after the May 5, 1995 expunging. Although this Court is troubled by the delay and the question regarding the accident report on Paulson's record in the interim, this Court finds that Respondents are not in civil contempt as to these DAC records. Moreover, given the prospective nature of civil contempt proceedings, the deletion of all DAC records as to Paulson and Moody renders moot any complaint previously existing.
 
 
 121
 In addition, this Court finds that the Preston documents do not represent a violation of the Sixth Circuit's Order. Preston's keeping of the documents in his litigation file was a reasonable action under the order. See Joshi v. Professional Health Serv., Inc., 606 F.Supp. 303, 306 (D.D.C.1985). The documents in the "junk file" should have been expunged and results in a technical violation of the Order. However, this Court finds the retention of these documents to be a minor and inadvertent action by Respondents.
 
 VII. Remedies
 A. Applicable Law
 
 122
 In civil contempt proceedings, sanctions may be imposed solely to coerce future compliance with the court's order or to compensate for injuries resulting from noncompliance. NLRB v. Aquabrom, Div. of Great Lakes Chem. Corp., 855 F.2d 1174, 1187 (6th Cir.1988); In re Jaques, 761 F.2d 302, 305-06 (6th Cir.1985). To be remedial rather than punitive, sanctions designed to coerce compliance must operate in a purely prospective manner. Shillitani v. United States, 384 U.S. 364, 370, 86 S.Ct. 1531, 1535, 16 L.Ed.2d 622 (1966). The focus is not how Respondents acted in the past, but how they should be compelled to act in the future. See Maggio v. Zeitz, 333 U.S. 56, 68 S.Ct. 401, 92 L.Ed.2d 476 (1948).
 
 
 123
 In coercing compliance with its orders, a court must exercise the least possible power adequate to the proposed end. Shillitani, 384 U.S. at 370. A prospective compliance fine is inappropriate unless Respondents have flagrantly violated the Sixth Circuit's Order. Florida Steel Corp. v. NLRB, 648 F.2d 233, 240 (5th Cir.1981). See, e.g., NLRB v. J.P. Stevens & Co., 563 F.2d 8, 25 (2d Cir.1977), cert. denied, 434 U.S. 1064, 98 S.Ct. 1240, 55 L.Ed.2d 765 (1978). Conversely, a prospective compliance fine is inappropriate if the Respondent has manifested a willingness to comply with the Court's Order.
 
 B. Discussion
 
 124
 Finding Paulson's second discharge pretextual, this Court recommends that the Sixth Circuit order Respondents to reinstate Paulson as directed by its original November 22, 1994 Order. In addition, in order to avoid any possible conflicts with DOT regulations, this Court recommends that Respondents permit Paulson to supplement his employment application to include his omitted employers. As a result of this Court's finding concerning Paulson, this Court recommends that Respondents' Motion to Amend Judgment be denied.
 
 
 125
 Next, this Court recommends that the Sixth Circuit reinstate the section of its order requiring Respondents to post notice. Recognizing that the last statement in the notice refers to Leonard Moody, this Court suggests that his name be removed to avoid any confusion. As discussed above, Moody was offered a job substantially equivalent to his prior one, which he rejected.
 
 
 126
 Third, this Court recommends that at the close of this case, the Sixth Circuit order the documents located in Preston's litigation and junk files be expunged.
 
 
 127
 Fourth, this Court does not address the issue of backpay. This issue should be resolved upon compliance with the Sixth Circuit's judgment in this case by the Board with the issuance of a backpay specification, and, if necessary, in an adversarial backpay proceeding. NLRB v. Deena Artware, Inc., 361 U.S. 398, 80 S.Ct. 441, 4 L.Ed.2d 400 (1960); Hyatt Corp. v. NLRB, 939 F.2d 361, 371 (6th Cir.1991).
 
 
 128
 Finally, in order to ensure Respondents' compliance, this Court recommends that the Respondents post a $25,000 bond in the Court's registry to be remitted to Respondents upon their compliance with the affirmative requirements of the Sixth Circuits's Order. See Baby Watson Cheesecake, Inc. 148 LRRM 2908 (1985), aff'g Special Master's Report, 148 LRRM 2897; see also NLRB v. Johnson Mfg. Co. of Lubbock, 511 F.2d 153, 156, 158-59 (5th Cir.1975), cert. denied, 423 U.S. 867 (1975).
 
 C. Assessment of Fees
 
 129
 As directed by the Sixth Circuit's November 14, 1995 Order designating this Court as Special Master, this Court does not address the final assessment and allocation of all costs, fees, and expenses involved, including counsel fees.
 
 
 130
 This Report and Recommendation is respectfully submitted this 26th day of June 1996.
 
 
 
 [1]
 Respondents Howard Baer, Inc. and Crystal Carriers are joint employers of the employees of Respondent Crystal Carriers, Inc. During the administrative law hearing, the parties stipulated that Howard Baer, Inc. exercised control over significant aspects of the employment relationship between Crystal Carriers, Inc. and the employees of Crystal Carriers, Inc
 
 
 [2]
 The original judgment and order of the Board concerning these allegations are in NLRB Case Nos. 7-CA-34536 and 7-CA-34670
 
 
 [3]
 Local Union No. 247, International Brotherhood of Teamsters, AFL-CIO
 
 
 [4]
 Despite the fact Respondents failed to raise their argument concerning their second discharge of and refusal of reinstatement to Paulson during the underlying unfair administrative labor practice proceeding, Respondents are not precluded from asserting their argument, albeit weak, in this proceeding. Pan American Electric, Inc., 321 NLRB No. 67, n. 4 (June 14, 1996). Respondents are correct in asserting that this issue could have been brought in the Board's compliance proceeding. Id. However, this fact does not change this Court's finding that Paulson's discharge was pretextual in nature
 
 
 [5]
 There is some confusion in the record as to the exact date of the change in times, the Romulus departure time, the Columbus pickup time, and the Romulus return arrival time. Despite this fact, the record is clear that a change in times did occur on or about May 3, 1994
 
 
 [6]
 As previously mentioned, the May 24, 1994 letter containing the offer of reinstatement makes no reference to a starting time. In his testimony, Moody asserts he knew his old job existed because Paulson's lady friend, who worked at the Columbus bakery, told Paulson, who then told Moody, that his prior job existed and that Charles Thompson had this job
 
 
 [7]
 Both Moody's and Baer's testimony concerning this conversation is a little unclear. Moody's testimony fails to describe the details of the phone conversation, stating only bits and pieces. In addition, Baer fills in some of the details and states that Moody was "rambling."
 
 
 [8]
 Given this Court's finding as to Moody, this Court does not address the issue of Moody's seniority as it has been mooted
 
 
 [9]
 These documents include Paulson's and Moody's employment application form and documents found in Preston's junk file